Loren BAGOLA, Plaintiff–Appellant,

v.

Thomas KINDT, et al., Defendants–
Appellees.

No. 97–1503.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 8, 1997.

Decided Dec. 5, 1997.

Eric A. Frey (argued), Frey & Francis, Terre Haute, IN, for Plaintiff–Appellant.

Judith A. Stewart, Office of the United States Attorney, Indianapolis, IN, Barbara L. Herwig, Robert M. Loeb (argued), Department of Justice, Civil Division, Appellate Section, Washington, DC, for Defendants–Appellees.

Before FLAUM, DIANE P. WOOD, and EVANS, Circuit Judges.

FLAUM, Circuit Judge.

While working for Federal Prison Industries, inmate Loren Bagola's right hand was severed when he slipped and caught his arm in a machine that was operating at the time. Alleging that the appellee prison factory offi-

cials were deliberately indifferent to his safety, Bagola brought a *Bivens*[1] claim against the appellees for violating his Eighth Amendment rights. The district court granted summary judgment to the appellees, finding that Bagola had not established an inference of the appellees' deliberate indifference towards inmate safety. We affirm.

## Background

In August 1989, Bagola was convicted in federal court of second-degree murder and of using a firearm during a crime of violence. He received a sentence of twenty years in prison and was committed to the United States Penitentiary in Terre Haute, Indiana (USPTH). Shortly thereafter, Bagola began work for Federal Prison Industries, Inc. (known as UNICOR), which is a government corporation within the Bureau of Prisons that provides industrial work programs and training opportunities to federal prisoners. Inmates must apply to work in UNICOR programs; applicants ordinarily are placed on waiting lists and will not be hired if UNICOR officials adjudge them a threat to safe factory operations. *See* 28 C.F.R. §§ 345.10–.50.

Bagola worked as a "card fixer" in the penitentiary factory's Card and Spin Department, which produced wool blankets. His responsibilities included cleaning, inspecting, and repairing twelve Whitten card machines—large textile machines used to manufacture wool. The twelve machines were aligned in two rows, and an aisle separated the rows of six machines. At the time of Bagola's accident, gates protected three sides of each machine. The side that faced the aisle remained completely exposed.

Bagola had been working in the Department for nearly two years when, on October 15, 1991, the unfortunate events giving rise to this litigation occurred. Bagola slipped on a patch of oil on the floor while he was inside the gates inspecting a Whitten machine that was in operation. He lost his balance and caught his hand in one of the machine's exposed parts—the "stripper roller." Bagola's cries of pain alerted one of his co-workers, inmate Steven Wallace, who turned off the machine. When factory officials extricated Bagola's arm from the roller, his right hand was missing. Bagola was rushed to the hospital, where efforts to reattach his hand proved unsuccessful.

Because he sustained his injury while working for UNICOR, Bagola was entitled to compensation for his injuries pursuant to 18 U.S.C. § 4126 and the regulations promulgated by the Attorney General thereunder. Section 4126(c)(4) permits UNICOR to compensate injured workers for their work-related injuries. Bagola received $928.32 in lost-time wages pursuant to 28 C.F.R. §§ 301.201–.204. In addition, Bagola may apply for compensation for the loss of his hand within forty-five days of his release from prison.[2] *See id.* § 301.303.

So far, the facts of this case, though tragic, constitute no more than a traditional worker's compensation case—albeit in a penological setting. Bagola's Eighth Amendment claim relies on additional facts that, he argues, indicate a history of safety problems in the factory and prison officials' indifference to those problems. We portray these facts in the light most favorable to Bagola, as we must when reviewing an appeal of the district court's award of summary judgment.

---

1. *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

2. Bagola is not guaranteed this compensation under the current regulations. The regulations provide that the administrative officials responsible for evaluating compensation claims may deny compensation for an injury that was sustained willfully or with the intent to injure another individual, or for an injury resulting from a "[w]illful violation of rules and regulations." 28 C.F.R. § 301.301(d). In Bagola's case, the appellees argue that Bagola was violating factory procedure by working inside the gates while the

Whitten machines were running, and they point to the fact that he was cited for a safety violation following the accident. *See* Appellees' Br. at 40–41 & n. 10. Even though Bagola already received compensation for lost-time wages, it remains unclear whether he will receive the additional compensation at the time of his release. *See* 28 C.F.R. § 301.202(b) ("A determination of work-relatedness for purposes of awarding lost-time wages is not confirmation on the validity of any subsequent claim to receive compensation for work-related physical impairment or death.").

See, e.g., Pasqua v. Metropolitan Life Ins. Co., 101 F.3d 514, 516 (7th Cir.1996).

While UNICOR industries are not required by law to comply with the Occupational Safety and Health Administration's (OSHA) safety standards, OSHA officials inspect federal prison industries and advise prison officials regarding perceived safety problems. When OSHA Compliance Officer Nick Antonio inspected the USPTH in September 1990, he found several safety violations, many of which pertained to the Whitten card machines. Antonio's report concluded that various nip points [3] on the machines were not adequately guarded, and that the machines were inadequately guarded in other ways as well. In response to these problems, Safety Manager R.J. Vastlik installed gates and cages around the machines, as well as an emergency shutoff cable that extended the full length of the machines. Vastlik informed then-Warden Thomas Kindt, in a January 15, 1991 memorandum, that all of the violations pertaining to the Whitten machines had been abated.

When he returned to the USPTH on August 27, 1991, Antonio learned that the violations had not, in fact, been sufficiently remedied. Instead, he found that various nip points on the machines remained inadequately guarded. Before OSHA issued any safety violation notices as a result of Antonio's August inspection, it sent a letter to Vastlik on October 11, outlining five non-mandatory proposals to abate the hazards posed by the Whitten machines.[4] The proposals included modifying the gates surrounding the machines to make them lock automatically when someone closes them; and increased supervision of workers, particularly while the gates were open and the machinery was operating. Then, on October 15, the day of Bagola's accident, OSHA issued three Notices of Un-

safe or Unhealthful Working Conditions as a result of Antonio's August inspection. OSHA sent these notices to Kindt by letter on October 16, but he did not receive the letter until October 21. Following these OSHA notices and Bagola's accident, factory officials installed new barrier gates, guards, and electric safety features to eliminate the possibility of worker access to nip points while the machines were running.

Notwithstanding the hazards posed by the card machines, the record reflects that factory officials took worker safety seriously. UNICOR safety officials conducted monthly safety inspections. Bagola, like other factory workers, was required to attend periodic safety talks; some of those that he attended include "Protecting Your Hands" and "Hand and Finger Injuries." In addition, Bagola received a job safety analysis that detailed the hazards of his job. The analysis indicated that he was not permitted inside the gates while the machines were energized, and that when inspecting or repairing a machine, he was required to ensure that the machine was not only turned off, but "locked out" so that no other employee could turn on the machine.

While Bagola acknowledges that he attended the safety meetings, and that he read the analysis and signed a declaration to comply with its requirements, he asserts that the reality of his employment duties was quite different. He claims that he was required to work inside the protective gates in the aisle between the machines and to inspect the machines while they were running. This requirement caused him to work around nip points that were left completely exposed. Bagola asserts that the factory officials knew that the Whitten machines were still dangerous, despite Vastlik's January 15th memorandum asserting that the unsafe conditions had been abated.[5]

3. A "nip point" is the point at which two moving machine parts—generally either a belt and pulley, or two rollers—come together.

4. This letter referenced a videotape sent to OSHA by Terah Tracy, UNICOR Factory Manager, that documented the hazards of the Whitten machines. The record does not reflect whether Tracy sent OSHA the videotape pursuant to Antonio's investigation, or whether this was the result

of an independent effort to abate the safety hazards. However, Tracy declares that no OSHA official made any indication of the continuing violations prior to sending a letter to Kindt on October 16. This declaration is undisputed.

5. In the district court, Bagola attempted to introduce evidence in his sworn declaration regarding prior accidents in the factory. The appellees moved to strike this evidence, and the district

Bagola filed this complaint in the Southern District of Indiana, seeking $750,000 in compensatory damages and $1,000,000 in punitive damages from each of the defendants. Bagola's amended complaint named five prison officials as defendants: then-Warden Kindt; Terah Tracy, the Factory Manager; Steve Ashley, the Assistant Factory Manager; and Thomas Clifton and Don Fountain, Lead Card and Spin Foremen at the factory.[6] The district court initially dismissed Bagola's *in forma pauperis* (IFP) petition as frivolous, on the ground that the Complaint did not allege the defendants' subjective, deliberate indifference to Bagola's safety, which is an essential element of his *Bivens* claim. *See Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994).

On appeal, this Court reversed the district court's denial of IFP status to Bagola, reasoning that the Complaint adequately alleged facts supporting the defendants' subjective, deliberate indifference. *See Bagola v. Kindt*, 39 F.3d 779, 780 (7th Cir.1994) (*Bagola I*). We also noted that the worker's compensation provided to Bagola by 18 U.S.C. § 4126 did not preclude his *Bivens* claim. Recognizing that this was an issue of first impression, we remanded to the district court with instructions to appoint counsel for Bagola. *See id.* On remand, the defendants filed a motion to dismiss or, in the alternative, for summary judgment. Reviewing the expanded evidentiary record, the court granted the summary judgment motion. The court found that the evidence did not establish an inference that the defendants acted with deliberate indifference toward worker safety.[7] The district court believed that the evidence supporting Bagola's assertions indicated nothing more than negligence, which would be insufficient to support an Eighth Amendment claim.

## Discussion

Bagola argues that the district court erred in granting summary judgment, because evidence in the record created a genuine issue regarding the appellees' deliberate indifference to inmate safety at the UNICOR factory. Before reaching this argument, we must consider the appellees' contention that the district court did not have jurisdiction under 28 U.S.C. § 1331 to hear Bagola's *Bivens* claim. They argue that the worker's compensation remedies provided to Bagola by 18 U.S.C. § 4126 are exclusive, thereby precluding his *Bivens* claim.

### I. *Bivens* Preclusion

### A. The Effect of *Bagola I*

■ The appellees argue that the exclusive remedy for Bagola's injury is to apply for compensation under 18 U.S.C. § 4126. That statute authorizes the Prison Industries Fund to pay "compensation to inmates employed in any industry ... for injuries suffered in any industry or in any work activity in connection with the maintenance or operation of the institution in which the inmates are confined." 18 U.S.C. § 4126(c)(4). According to the appellees, Congress's creation of this remedial scheme precludes inmates who are injured in an "industry" or "work activity" from bringing *Bivens* claims against individual prison officials alleged to have inflicted cruel and unusual punishments on those inmates in violation of the Eighth Amendment. We addressed this issue briefly in *Bagola I*, where we held that § 4126 did not preclude Bagola's *Bivens* claim. 39 F.3d at 780. The appellees urge us to revisit this ruling; they argue that we are not bound by the decision in *Bagola I*, which was an *ex*

court disregarded it in granting summary judgment. The court found that the evidence was not based on personal knowledge and that Bagola had not established a foundation for his allegations. *See* Fed.R.Civ.P. 56(e). Although Bagola's appellate brief refers to this evidence, he does not appeal the district court's ruling on the appellees' motion to exclude it, and we accordingly do not consider it on appeal.

6. The district court dismissed Bagola's claims against Kindt and Fountain, neither of whom

were *properly served with process, for lack of in personam* jurisdiction. Bagola does not appeal those dismissals.

7. Because the district court concluded that the appellees did not violate Bagola's constitutional rights, the court did not determine, under a qualified immunity analysis, whether the asserted rights were clearly established at the time of Bagola's injury.

*parte* appeal of the district court's denial of IFP status to Bagola.[8]

In *Bagola I*, we reasoned that absent specific language in either § 4126 or the Federal Tort Claims Act (FTCA) [9] expressly abrogating a prisoner's ability to file a Bivens suit for work-related injuries, a constitutional claim remained available to the appellant.[10] *See* 39 F.3d at 780. As the appellees argue, however, we recognized that the last word had not been uttered on this issue when we decided *Bagola I*. Although the Court observed that "the lower court properly held" that § 4126 does not preclude a *Bivens* suit, 39 F.3d at 780, we also demonstrated an intent to consider this issue more fully at a later date. In remanding the case to the district court, we instructed the court to appoint counsel for Bagola, since "[o]ur holding concerning the relationship between *Bivens* suits and the prisoner worker's compensation system is one of first impression, and it may lead to further complex legal arguments necessitating the services of an attorney." *Id.* at 781. Given this recognition, and the fact that *Bagola I* was an *ex parte* appeal involving only the district court's denial of Bagola's request for IFP status, we do not consider ourselves bound by *Bagola I* on this point.

■■■ Moreover, we do not consider our statement in *Bagola I* the governing law of the case. The law of the case doctrine should not be read so rigidly that it precludes a party from raising an argument that it had no prior opportunity to raise. The appellees were not parties to *Bagola I;* because they had never been served, neither the district court nor this Court had jurisdiction over them. *See Barrett v. Baylor,* 457 F.2d 119, 123 (7th Cir.1972) (law of the case presumes that the rendering federal court had jurisdiction over the subject matter and the parties). Because, ultimately, the law of the case is a discretionary doctrine, we will not apply it to a situation in which a court did not have jurisdiction over any adverse parties when it rendered its initial decision. *Cf. Champaign–Urbana News Agency v. J.L. Cummins News Co.,* 632 F.2d 680, 683 (7th Cir.1980) ("To modify the law of the case is primarily a matter of 'good sense.' "). Accordingly, we shall consider whether § 4126's compensation scheme is an exclusive remedy that precludes Bagola's *Bivens* claim.

**B. Statutory Preclusion of *Bivens* Remedies**

Bagola invoked the jurisdiction of the district court pursuant to 28 U.S.C. § 1331 under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *Bivens* established that the victim of an alleged constitutional violation by federal agents—in that case, an illegal search and seizure in violation of the Fourth Amendment—could recover damages against those individual agents by proceeding directly under the Constitution, despite the absence of a statute that specifically conferred such a cause of action. In *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), the Supreme Court extended this right to federal prisoners seeking compensation for cruel and unusual punishments inflicted by prison officials in violation of the Eighth

8. Because the district court denied Bagola's application to proceed *in forma pauperis,* the appellees had never been served with process when we heard *Bagola I.* They did not enter an appearance in that appeal, which this Court allowed to proceed without the filing of an appellees' brief, *see Bagola v. Kindt,* 39 F.3d 779 (7th Cir.1993), and which we decided without oral argument.

9. Federal prisoners who are injured outside of their prison employment are entitled to sue the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680, for torts committed by government employees. *See United States v. Muniz,* 374 U.S. 150, 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). In certain circum-

stances, such as the violation of an individual's constitutional rights by a government employee, the FTCA permits a constitutional tort action against the employee in his individual capacity. See 28 U.S.C. § 2679(b)(2)(A). FTCA and *Bivens* actions in such circumstances are "parallel, complementary causes of action." *Carlson v. Green,* 446 U.S. 14, 20, 100 S.Ct. 1468, 1472, 64 L.Ed.2d 15 (1980).

10. Since our decision in *Bagola I,* another court of appeals has followed our holding, but it did not add significant further analysis. *See Vaccaro v. Dobre,* 81 F.3d 854, 857 (9th Cir.1996). We are also aware of unpublished decisions by federal courts holding that § 4126 precludes a *Bivens* claim.

Amendment. However, the Supreme Court repeatedly has warned federal courts to exhibit caution in extending *Bivens* remedies into new contexts. *See, e.g., F.D.I.C. v. Meyer,* 510 U.S. 471, 484, 114 S.Ct. 996, 1005, 127 L.Ed.2d 308 (1994); *Schweiker v. Chilicky,* 487 U.S. 412, 421, 108 S.Ct. 2460, 2466–67, 101 L.Ed.2d 370 (1988); *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983); *see also Paige v. Cisneros,* 91 F.3d 40, 43–44 (7th Cir.1996) (recognizing the Supreme Court's admonition to exhibit caution in extending *Bivens* causes of action). It is therefore incumbent upon this Court to proceed cautiously in determining whether to permit Bagola to state a cause of action generally available to federal prisoners.

### 1. The Lessons of *Carlson v. Green*

■ The Supreme Court in *Carlson* considered the availability to federal prisoners of a *Bivens* cause of action.[11] Although *Carlson* is not conclusive on the question of whether § 4126 precludes *Bivens* claims, we recognize at the outset that *Carlson*'s analysis of why the FTCA does not preclude *Bivens* is instructive on this point. The *Carlson* Court recognized that the prisoner's claim could also have been stated as a claim against the United States under the FTCA. *See Carlson,* 446 U.S. at 16–17, 100 S.Ct. at 1470–71. Nonetheless, the Court found no "special factors counselling hesitation [in recognizing the *Bivens* claim] in the absence of affirmative action by Congress." *Id.* at 19, 100 S.Ct. at 1471–72. The Court reasoned that the availability of a *Bivens* cause of action would not overly chill the performance of the defendants' official duties, since they were accorded qualified immunity under *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).[12] *See Carlson,* 446 U.S. at 19, 100 S.Ct. at 1471–72.

The Court also did not believe that Congress, in amending the FTCA to cover intentional torts committed by federal law enforcement officers, 28 U.S.C. § 2680(h), intended to preclude *Bivens* claims. *See Carlson,* 446 U.S. at 19–20, 100 S.Ct. at 1471–72. The Court concluded that "the congressional comments accompanying that amendment made it crystal clear that Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Id.* The Court quoted from the Senate Report:

[I]nnocent individuals who are subjected to raids [like that in *Bivens*] will have a cause of action against the individual Federal agents *and* the Federal Government. Furthermore, this provision should be viewed as a *counterpart* to the *Bivens* case and its progeny [*sic*], in that it waives the defense of sovereign immunity so as to make the Government independently liable in damages for the same type of conduct that is alleged to have occurred in *Bivens* (and for which that case imposes liability upon the individual Government officials involved).

*Id.* at 20, 100 S.Ct. at 1472 (second and third alterations in original) (quoting S.REP. No. 93–588, at 3 (1973)). Finding no indication that Congress intended the FTCA remedy to replace the *Bivens* remedy, the Court held that prisoners who were "victims of the kind of intentional wrongdoing alleged in this complaint shall have an action under FTCA against the United States as well as a *Bivens* action against the individual officials alleged to have infringed their constitutional rights." *Id.*

In addition, the Court considered four factors that suggested that a *Bivens* remedy is more effective than the FTCA remedy, supporting the conclusion that Congress did not intend the FTCA to preclude a prisoner's

---

**11.** The respondent in *Carlson* brought suit under *Bivens* on behalf of the estate of her son, Joseph Jones, Jr., who died while incarcerated at the Federal Correction Center in Terre Haute, Indiana. The Estate alleged that the prison official defendants were *deliberately indifferent* to Jones's medical needs and that their acts and omissions caused him to die from an asthmatic attack. The complaint alleged that the officials' indifference was partly attributable to racial prej-

udice. *See* 446 U.S. at 16 n. 1, 100 S.Ct. at 1470 n. 1.

**12.** Following *Carlson,* the protection accorded government officials asserting a qualified immunity defense was strengthened by *Harlow v. Fitzgerald,* 457 U.S. 800, 815–18, 102 S.Ct. 2727, 2736–38, 73 L.Ed.2d 396 (1982), which eliminated inquiry into those officials' subjective good faith.

*Bivens* claim. *See id.* at 20–23, 100 S.Ct. at 1472–74. Three of those factors are relevant to Bagola's appeal.[13] The first factor recognized an additional, non-compensatory purpose of a *Bivens* remedy: "Because the *Bivens* remedy is recoverable against individuals, it is a more effective deterrent than the FTCA remedy against the United States. It is almost axiomatic that the threat of damages has a deterrent effect, surely particularly so when the individual official faces personal financial liability." *Id.* at 21, 100 S.Ct. at 1473 (footnote and citation omitted). Second, the Court noted that, while punitive damages presumably were available in an appropriate *Bivens* suit, the FTCA prohibited punitive damages. Because punitive damages "are especially appropriate to redress the violation by a Government official of a citizen's constitutional rights," *id.* at 22, 100 S.Ct. at 1473, the Court concluded that the FTCA is "that much less effective than a *Bivens* action as a deterrent to unconstitutional acts." *Id.* The third factor recognized that, unlike in a *Bivens* suit, an FTCA plaintiff could not choose a jury trial, and the Court found no reason why a plaintiff should not retain this choice. *Id.* at 22–23, 100 S.Ct. at 1473–74.[14] Considering these factors *in toto,* the Court concluded that the "FTCA is not a sufficient protector of the citizens' constitutional rights." *Id.* at 23, 100 S.Ct. at 1474. Absent a clear statement of congressional intent, the Court refused to limit federal prisoners to the statutory remedy. *See id.*

Were we to consider *Carlson*'s dictates alone in deciding whether Bagola can properly state a *Bivens* claim, an answer in the affirmative would almost be compelled. As with the FTCA, § 4126 contains no explicit congressional statement that a *Bivens* remedy should not be available to federal prison-

ers compensated under the statutory scheme. In addition, the deterrence factor, implicated by both individual liability and the availability of punitive damages, and the availability of a jury trial weigh even more heavily in favor of allowing a *Bivens* claim here than they did in *Carlson.* In this case, no trial is held at all, because the statute establishes a system of no-fault worker's compensation. *See* 18 U.S.C. § 4126(c). Under this system, it is highly unlikely that any untoward, much less unconstitutional, conduct that may have caused the injury will come to light, for fault never is at issue. While an FTCA claim may have *some* deterrent value, since the underlying conduct at least will come to light at trial, § 4126 serves minimal deterrent purposes in providing a no-fault remedy against the government. If exclusive, § 4126 would not only insulate individual offenders from liability, but it would also effectively insulate their conduct from review in any trial-like forum. Since "[i]t must be remembered that the purpose of *Bivens* is to deter *the officer,*" *FDIC v. Meyer,* 510 U.S. 471, 485, 114 S.Ct. 996, 1005, 127 L.Ed.2d 308 (1994) (citing *Carlson,* 446 U.S. at 21, 100 S.Ct. at 1472–73), this factor weighs heavily in our analysis under *Carlson.* Section 4126 also fails to provide for jury trials; thus, the three applicable *Carlson* factors all counsel in favor of enabling Bagola to state a claim under both *Bivens* and § 4126.

However, *Carlson* also requires courts to determine whether any "special factors counsel[ ] hesitation in the absence of affirmative action by Congress." 446 U.S. at 18, 100 S.Ct. at 1471 (*quoting Bivens,* 403 U.S. at 396, 91 S.Ct. at 2004–05). The Supreme Court subsequently has refined this inquiry to require, *inter alia,* investigation of whether in the face of a statutory remedial scheme, Congress's failure to provide a constitutional

---

13. The fourth factor supporting the superiority of *Bivens* was its uniform availability; remedies under the FTCA, in contrast to *Bivens,* are available only when the applicable state law recognizes a cause of action to challenge the defendant's alleged misconduct. *See id.* at 23, 100 S.Ct. at 1474. Because § 4126 creates a uniform federal compensation scheme, we need not worry about leaving federal prisoners to suffer under the potential vagaries of State law in this case.

14. Responding to the prison officials' argument that the availability of either a jury trial or punitive damages was irrelevant, since neither was a necessary element of a remedial scheme, the Court stated that this argument "completely misses the mark. The issue is not whether a *Bivens* cause of action or any one of its particular features is essential. Rather the inquiry is whether Congress has created what it views as an equally effective remedial scheme." *Id.* at 22 n. 10, 100 S.Ct. at 1474 n. 10.

remedy was inadvertent or intentional: "When the design of a Government program suggests that Congress has provided what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of its administration, we have not created additional *Bivens* remedies." *Schweiker v. Chilicky,* 487 U.S. 412, 423, 108 S.Ct. 2460, 2468, 101 L.Ed.2d 370 (1988). Given that we have been admonished repeatedly by the Supreme Court to proceed cautiously in extending *Bivens* into new contexts, *see, e.g., Meyer,* 510 U.S. at 484, 114 S.Ct. at 1004–05, we must consider § 4126 in light of this refined "special factors" inquiry, notwithstanding the fact that the Eighth Amendment has already been held by the Supreme Court to support some *Bivens* claims. *Compare, e.g., Davis v. Passman,* 442 U.S. 228, 248–49, 99 S.Ct. 2264, 2278–79, 60 L.Ed.2d 846 (1979) (allowing a *Bivens* claim under the equal protection prong of the Fifth Amendment's Due Process Clause to redress alleged gender discrimination in employment), *with Schweiker v. Chilicky,* 487 U.S. 412, 429, 108 S.Ct. 2460, 2470–71, 101 L.Ed.2d 370 (1988) (refusing to allow a *Bivens* claim for alleged due process violations resulting from the denial of Social Security disability benefits). *Carlson*'s holding that federal prisoners may sue prison officials under the Eighth Amendment in certain circumstances therefore does not settle the question of whether Bagola can state an Eighth Amendment claim for his work-related injury, given the compensation scheme established by § 4126.

### 2. The "Special Factors" Inquiry

The Supreme Court has stated that *Bivens* actions shall not be implied in two situations:

> The first is when defendants demonstrate "special factors counseling hesitation in the absence of affirmative action by Congress." The second is when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective.

*Carlson,* 446 U.S. at 18–19, 100 S.Ct. at 1471 (citations omitted) (*quoting Bivens,* 403 U.S.

at 396, 91 S.Ct. at 2004–05). Subsequent cases indicate that "special factors" can include congressional preclusion of *Bivens* remedies by implication, even when the alternative remedy is *not* viewed as equally effective. *See Schweiker v. Chilicky,* 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988); *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). Accordingly, the special factors inquiry has, in large part, swallowed the second inquiry. *See* Gene R. Nichol, Bivens, Chilicky, *and Constitutional Damages Claims,* 75 Va. L.Rev. 1117, 1125 (1989) (arguing that the Supreme Court "seemed to merge the two exceptions" in *Bush* and *Chilicky*).

In *Bush,* the petitioner, a NASA employee, was demoted after publicly criticizing his superiors. Although Bush won reinstatement and back pay through his administrative appeals, Bush also pursued constitutional remedies under *Bivens,* arguing that the administrative remedy would not sufficiently compensate him for his constitutional injury. *See* 462 U.S. at 369–72, 103 S.Ct. at 2406–09. The Court noted that the second situation described in *Carlson* was not present: Congress had not expressly indicated that the existing statutes providing civil service remedies constituted the exclusive avenue of redress, precluding a *Bivens* claim. Even assuming *arguendo* that Bush's superiors had violated his First Amendment rights, and that the civil service remedies afforded Bush were not as effective in providing full compensation as would be an individual damages remedy, the Court held nonetheless that Bush could not pursue a *Bivens* claim against his superiors. *Id.* at 372–73, 103 S.Ct. at 2408–09.

The *Bush* Court considered the extensive administrative review system available to civil service employees, which included a "trial-type hearing" before the Federal Employee Appeals Authority, *id.* at 387, 103 S.Ct. at 2416, and the comprehensive nature of the remedies provided, and concluded that the system provided by Congress constituted a "special factor" that counselled against the creation of a judicially-implied *Bivens* remedy. *Id.* at 385–88, 103 S.Ct. at 2414–17. Even if the "existing remedies do not provide

complete relief for the plaintiff," *id.* at 388, 103 S.Ct. at 2417, the Court emphasized that Congress had created a system providing "meaningful remedies for employees who may have been unfairly disciplined for making critical comments about their agencies." *Id.* at 386, 103 S.Ct. at 2415. Recognizing the "careful attention" Congress had given to the sensitive policy question inherent in balancing employee rights and government efficiency, the Court refused to require that Bush be provided a constitutional remedy to supplement the regulatory scheme. *Id.* at 388–90, 103 S.Ct. at 2416–18. The Court concluded that Congress was in a better position to determine whether this additional remedy should be provided to civil service employees. *Id.* at 390, 103 S.Ct. at 2417–18.

In *Schweiker v. Chilicky*, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988), the Court expanded upon the concept of special factors. The plaintiffs in *Chilicky* were recipients of Social Security disability benefits who claimed that government officials had violated their due process rights in improperly denying their benefits. In an attempt to reduce the costs of the disability benefits program, the plaintiffs' benefits were wrongly terminated by state agencies implementing the program, only to be reinstated by an administrative law judge. 487 U.S. at 415–17, 108 S.Ct. at 2463–65. Though the respondents had received their back benefits, there was "little doubt that [the termination program] led to many hardships and injuries that could never be adequately compensated" through the administrative scheme. *Id.* at 417, 108 S.Ct. at 2464–65. Because the scheme merely provided the plaintiffs with the benefits to which they were entitled by statute, there was no question that the plaintiffs had not received any compensation for their constitutional injuries. *See id.* at 427–28, 108 S.Ct. at 2469–70.

Yet despite the incomplete administrative remedies that Congress afforded the respondents in *Chilicky*, the Court declined to recognize a *Bivens* due process claim against the program's administrators. The plaintiffs argued that the case could be distinguished from *Bush* because in *Bush*, the plaintiff received compensation through the adminis-

trative scheme for the constitutional violation itself; the *Chilicky* plaintiffs merely received the compensation to which they would have been entitled regardless of any constitutional injury. The Court rejected this argument:

> [*Bush*] drew no distinction between compensation for a 'constitutional wrong' and the restoration of statutory rights that had been unconstitutionally taken away.... *Bush* thus lends no support to the notion that statutory violations caused by unconstitutional conduct necessarily require remedies in addition to the remedies provided generally for such statutory violations.

*Id.* at 427, 108 S.Ct. at 2469–70.

■ Applying *Bush* and *Chilicky*, we have recognized that in some circumstances, "courts may not provide constitutional remedies to supplement a congressionally-established administrative system even where that system's remedies are not as complete as the constitutional remedy might be." *Robbins v. Bentsen*, 41 F.3d 1195, 1201 (7th Cir.1994). Implicit in this recognition is the principle that the absence of a remedy for a constitutional violation does not mean that Congress failed to consider constitutional injuries in enacting its remedial scheme. *See Chilicky*, 487 U.S. at 423, 108 S.Ct. at 2468 (stating that courts considering extending *Bivens* claims should give "appropriate judicial deference to indications that congressional inaction has not been inadvertent"). The key inquiry is whether Congress intended to redress constitutional violations with a remedy other than damages—by providing a remedial scheme with procedural safeguards sufficient to protect individual's constitutional rights. *See, e.g., Robbins*, 41 F.3d at 1202 ("We are clearly presented with a situation in which Congress has provided an elaborate remedial scheme ... for the protection of Robbins's constitutional rights in the employment context."); *Feit v. Ward*, 886 F.2d 848, 855 (7th Cir.1989) ("Because Congress has provided Feit ... with an avenue of relief to redress violations of [his] constitutional rights, it cannot be said that Congress' omission of a separate damages remedy for constitutional violations from the remedies available under the [statute] was inadvertent.").

In some cases, the "special factors" analysis may indicate that Congress's inaction was, in fact, inadvertent. Under these circumstances, a *Bivens* remedy may be appropriate. However, when it is evident that congressional omission of a separate damages remedy for constitutional violations is not inadvertent, then the special factors inquiry compels preclusion of *Bivens* claims.

The appellees point to the Supreme Court's treatment of § 4126 in *United States v. Demko*, 385 U.S. 149, 87 S.Ct. 382, 17 L.Ed.2d 258 (1966), as indicating the existence of special factors in this case. In *Demko* the Supreme Court held that the plaintiff, a prisoner who was seriously injured while working for Federal Prison Industries, was precluded from bringing an FTCA claim against the United States and was limited to an exclusive remedy under § 4126.[15] The Court discussed the history of no-fault worker's compensation laws and stated that "compensation laws are practically always thought of as substitutes for, not supplements to, common-law tort actions." *Id.* at 151, 87 S.Ct. at 383–84. The Court reasoned that absent any legislative indication to the contrary, § 4126 would be presumed an "exclusive remedy" to protect federal prison workers: "[The] law, as shown by its regulations, its coverage and the amount of its payments to the injured and their dependents, compares favorably with compensation laws all over the country." *Id.* at 152, 87 S.Ct. at 384. Unless instructed otherwise by Congress, the Court would "accept the prison compensation law as an adequate substitute for a system of recovery by common-law torts." *Id.* at 153, 87 S.Ct. at 385.

■ The appellees argue that the Supreme Court's decision in *Demko* should end our inquiry and preclude a *Bivens* remedy for Bagola. This argument is consistent with the "special factors" inquiry under *Chilicky:*

Even if the remedies provided by Congress are incomplete, an adequate remedial scheme exists. As this Court has recognized in cases after *Chilicky*, courts cannot supplement statutory remedies simply because they are not as complete as a constitutional remedy might be. *See, e.g., Paige v. Cisneros*, 91 F.3d 40, 44 (7th Cir.1996); *Robbins v. Bentsen*, 41 F.3d 1195, 1201(7th Cir.1994); *Assar v. Crescent Counties Found. for Med. Care*, 13 F.3d 215, 219 (7th Cir.1993), *cert. denied*, 513 U.S. 816, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994). Only when we are convinced that Congress's failure to provide a constitutional remedy was inadvertent, or when Congress otherwise indicates that it did not consider the established remedies adequate to address constitutional violations, should we recognize an implied *Bivens* remedy. Given the Supreme Court's treatment of § 4126 in *Demko*, Appellees argue that a *Bivens* remedy would be particularly inappropriate in this case.

### 3. Special Factors Analysis of § 4126

■ In considering whether "special factors" should lead us to hold that § 4126 precludes Bagola's *Bivens* claim, it is true that there exists some tension in extending a *Bivens* remedy to Bagola: Like the injuries to the *Chilicky* plaintiffs, Bagola's alleged constitutional injury is intertwined with his injury covered by the statutory benefits scheme. *Cf. Chilicky*, 487 U.S. at 428, 108 S.Ct. at 2470 ("[T]he harm resulting from the alleged constitutional violation can[not] be separated from the harm resulting from the denial of the statutory right."). Nonetheless, we believe that significant procedural distinctions exist between the remedies provided by § 4126 and the statutory remedies that have been found to preclude *Bivens* claims. These distinctions indicate that Congress does not consider § 4126 an adequate remedial mechanism to address Eighth Amend-

---

15. Of course *Demko*, which was decided 5 years before *Bivens*, did not explicitly touch upon the issue of preclusion of constitutional remedies. Instead, it addressed only whether the compensation provision of § 4126 served as "an adequate substitute for a system of recovery by common-law torts," 385 U.S. at 153, 87 S.Ct at 385, otherwise vindicable under the FTCA. *Bivens* is not a common-law remedy in the traditional

sense; it is a constitutional one. *See Gorden v. Kreul*, 77 F.3d 152, 155 (7th Cir.1996) (stating that *Bivens* is "effectively a system of federal *constitutional* common law") (emphasis added). Because the issue in this case is whether § 4126 precludes constitutional remedies, not common-law remedies, *Demko*'s analysis is pertinent only with respect to the question of whether special factors counsel hesitation.

ment violations, just as surely as it does not consider the FTCA an adequate mechanism to remedy non-work-related prisoner claims. *See Carlson*, 446 U.S. at 19, 100 S.Ct. at 1471–72. Our analysis is guided by the deterrence factor identified in *Carlson*, as well as the recognized necessity to provide *some* forum for a prisoner's constitutional claims.

In both *Bush* and *Chilicky*, it is significant that although the plaintiffs were denied a constitutional remedy, the statutory alternative provided a forum where the allegedly unconstitutional conduct would come to light. In *Bush*, the plaintiff was protected by an "elaborate" and "comprehensive" civil service system, in which "[c]onstitutional challenges to agency action, such as the First Amendment claims raised by [Bush], are fully cognizable." 462 U.S. at 385–86, 103 S.Ct. at 2414–16. As noted previously, this system included the power to hold a "trial-type hearing" and to secure the attendance and testimony of agency officials. *Id.* at 387, 103 S.Ct. at 2416. Such procedural safeguards would provide adversely affected civil servants the opportunity to expose the unconstitutional conduct of government officials and thereby would presumably help to deter future unconstitutional conduct. *See id.* at 385, 103 S.Ct. at 2414–15 ("Federal civil servants are now protected by an elaborate, comprehensive scheme that encompasses substantive provisions forbidding arbitrary action by supervisors and procedures—administrative and judicial—by which improper action may be redressed.").

Similarly, the plaintiffs in *Chilicky* were given ample opportunity to unearth in an administrative forum any unconstitutional conduct that may have resulted in the improper denial of their Social Security benefits. Under the established administrative system, a federal administrative law judge reviewed a state agency's denial of benefits, and claimants were entitled to introduce new evidence and raise new issues. If unsuccessful, claimants could seek review by the Social Security Administration's Appeals Council. *See* 487 U.S. at 424, 108 S.Ct. at 2468. This "elaborate" system, *id.* at 425, 108 S.Ct. at 2468–69, led the Supreme Court to conclude that even though the constitutional injury

might go unredressed, Congress "has not failed to provide meaningful safeguards or remedies for the rights of persons situated as respondents were." *Id.* at 425, 108 S.Ct. at 2468. In fact, this review system alerted Congress that state agencies were routinely terminating benefits improperly and led Congress to amend the statute by continuing benefits pending an ALJ's decision. *See id.* at 415, 108 S.Ct. at 2463–64. Accordingly, although the *Chilicky* plaintiffs were concededly not fully compensated for their injuries, the administrative system was effective in exposing the unconstitutional conduct that had occurred.

In cases in which this Court has held that a statute precluded a *Bivens* claim, the alternative remedial system similarly provided a significant opportunity to expose allegedly unconstitutional conduct. For example, in *Robbins* the plaintiff was an IRS employee who attempted to bring Fifth and First Amendment claims against her superiors. *See* 41 F.3d at 1200. We held that the procedural safeguards created by the Civil Service Reform Act of 1978 (CSRA) fully addressed and protected Robbins's constitutional rights in the employment context: "Robbins had the opportunity under the CSRA to bring any 'prohibited personnel practice' to the attention of the [Office of Special Counsel], which could have then investigated her complaint." *Id.* at 1202. Although Robbins may not have been able to receive damages specifically for her constitutional injury, the unconstitutional conduct would be addressed. In *Assar v. Crescent Counties Foundation for Medical Care*, 13 F.3d 215 (7th Cir.1993), *cert. denied*, 513 U.S. 816, 115 S.Ct. 73, 130 L.Ed.2d 28 (1994), the plaintiff physician attempted to bring a due process claim against a peer review organization (PRO) that found him in violation of certain quality of care requirements. We dismissed Assar's *Bivens* claim, since "Congress has created a comprehensive scheme by which physicians can obtain review of PRO decisions affecting their participation in the Medicare program." *Id.* at 219. Once again, even though a separate remedy for the constitutional harm was not available under the statute, the conduct itself could be reviewed extensively through an administrative

hearing, as well as administrative and judicial review. *See id.; see also Gorden v. Kreul,* 77 F.3d 152, 155–56 (7th Cir.1996) (holding that the *Bivens* claim of a farmer challenging the Government's seizure of his collateral was precluded by the available administrative and statutory remedies); *Feit v. Ward,* 886 F.2d 848, 851–52 (7th Cir.1989) (recognizing that "the CSRA provides Feit and other similarly situated federal employees with an avenue for raising alleged constitutional violations"); *Moon v. Phillips,* 854 F.2d 147, 151–52 (7th Cir.1988) (distinguishing cases in which plaintiffs did not have administrative remedies available to them, and dismissing Moon's *Bivens* claim because his "applicable administrative remedy is through the Merit Systems Protection Board, to which Congress granted broad jurisdiction to resolve all contested federal personnel matters").

█ It is evident in these cases that Congress intended to encompass administrative review of constitutional violations in crafting its remedial scheme, even though it may not have provided specific relief for these violations. Administrative schemes that expose unconstitutional conduct by government officials, even if they do not provide a distinct remedy for that conduct, serve a deterrent purpose that renders the availability of a *Bivens* claim less essential. If an administrative scheme that did not safeguard a claimant's constitutional rights precluded a *Bivens* claim, unconstitutional conduct would be insulated from review by any adjudicatory forum. Such a result would stand in sharp contrast to those cases in which courts have held that an administrative scheme precludes a *Bivens* claim. For example, although the *Chilicky* plaintiffs were not compensated for their constitutional injuries, the statutory scheme was fully effective in exposing the unconstitutional conduct and in influencing Congress to amend the disability benefits program. *See Chilicky,* 487 U.S. at 415–17, 108 S.Ct. at 2463–65. Similarly, in *Bush,* Congress provided federal employees an elaborate administrative system through which violations of First Amendment rights could be addressed and remedied. *See Bush,*

462 U.S. at 385–88, 103 S.Ct. at 2414–17. Even though the officials responsible for constitutional violations would be protected from individual liability suits, their unconstitutional conduct presumably would not go unnoticed within the Government. Accordingly, in such cases the courts should not override the congressional decision not to provide a distinct constitutional remedy by recognizing a remedy under *Bivens. See, e.g., Chilicky,* 487 U.S. at 429, 108 S.Ct. at 2470–71; *Bush,* 462 U.S. at 389, 103 S.Ct. at 2417. However, when the procedural safeguards of an administrative scheme are inadequate protectors of constitutional rights, courts should not readily assume that a *Bivens* claim is precluded.

In the instant case, it is evident that the statutory scheme lacks the requisite procedural safeguards of Bagola's constitutional rights. For example, because § 4126 is a *no fault* compensation scheme, the conduct that caused the work-related injury is not relevant and likely will not be exposed by the claim evaluation process. Moreover, the regulations promulgated under § 4126 do not allow an inmate to file for compensation earlier than forty-five days prior to his release from prison. *See* 28 C.F.R. § 301.303(a). A decision on compensation could occur years after a constitutional injury,[16] when evidence likely will have been lost, offenders may no longer be federal employees, and other prisoners may have been subsequently subjected to similar unconstitutional abuses. Section 4126 not only insulates prison officials who violate an individual's constitutional rights from individual liability, as would be the case in all instances of *Bivens* preclusion; it also shrouds their potentially unconstitutional conduct within a no-fault compensation system.

Unlike the statutes that have been held to preclude separate *Bivens* actions, we believe that § 4126 possesses very little, if any, deterrent value. Moreover, granting preclusive effect to a statute wholly lacking both procedural safeguards and deterrent value would be particularly anomalous in the context of prisoner litigation. It is true that the courts must give "due regard for prison

---

**16.** For example, Bagola could not file until 2006 (his projected date of release) for compensation stemming from this injury, which occurred in 1991.

officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer v. Brennan*, 511 U.S. 825, 845, 114 S.Ct. 1970, 1983, 128 L.Ed.2d 811 (1994) (quotations omitted). However, when considering whether those officials violated a prisoner's constitutional rights, we have never wavered from recognizing that "[f]ederal courts must take cognizance of the valid constitutional claims of prison inmates." *Babcock v. White,* 102 F.3d 267, 275 (7th Cir.1996) (*quoting Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987)). Although work-related injuries may rarely rise to the level of an Eighth Amendment violation, it is important to provide a *Bivens* remedy in this context in order to deter and redress those violations that do occur. "Because a prisoner ordinarily is divested of the privilege to vote, the right to file a court action might be said to be his remaining most fundamental political right, because preservative of all rights." *McCarthy v. Madigan*, 503 U.S. 140, 153, 112 S.Ct. 1081, 1091, 117 L.Ed.2d 291 (1992) (quotations omitted). *Bivens* and its progeny indicate that this right can be limited by Congress, either explicitly or by enacting a comprehensive remedial scheme with adequate procedural safeguards. However, without an explicit indication from Congress, we will not foreclose this right when the statutory remedy is wholly inadequate.

█ Finally, we must address the appellees' argument that Congress explicitly indicated its intent to preclude *Bivens* claims by providing that: "In no event may compensation for such injuries be paid in an amount greater than that provided in [the Federal Employees Compensation Act]." 18 U.S.C. § 4126(c). Although it is possible that a federal prisoner who receives awards under both § 4126 and *Bivens* may end up with more money than would a federal employee under FECA, we do not believe that this potential outcome violates the command of the statute. Both the prisoner, under § 4126, and the federal employee, under FECA, would receive compensation for their physical injuries. It is in this context that the compensation awarded the prisoner cannot exceed FECA levels. However, the compensation received by a successful *Bivens* plaintiff is entirely different; [17] a *Bivens* award compensates a prisoner for the torture and unnecessary pain, *see Estelle v. Gamble*, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976), inflicted upon him in violation of the Eighth Amendment—an injury that could never be inflicted upon other federal workers.[18] Because the two remedies compensate two separate injuries, Congress's admonition is entirely consistent with § 4126 and *Bivens* coexisting as complementary causes of action. Accordingly, we hold that the district court properly had jurisdiction under 28 U.S.C § 1331 to hear Bagola's *Bivens* claim.

## II. The Merits of Bagola's Claim

Turning to the merits of Bagola's Eighth Amendment claim, we review the district court's award of summary judgment *de novo* and will construe the evidence and all reasonable inferences in the light most favorable to

17. To the extent that a *Bivens* plaintiff is awarded a judgment for his actual physical injuries, the *Bivens* recovery should set off any statutory remedy under § 4126.

18. For much the same reasons, we reject the appellees' argument that because Bagola's participation in the UNICOR program was voluntary, the conditions to which he was subjected cannot be considered part of his nonvoluntary "conditions of confinement," and accordingly, cannot constitute punishment cognizable under the Eighth Amendment. Whether or not a worker's voluntary participation in UNICOR would ordinarily remove him from the Eighth Amendment's protective umbrella, it is apparent that voluntariness ends at the point where cruel and unusual punishments begin. Even while working, UNICOR employees remain subject, as prisoners, to disciplinary restrictions. Although such cases likely are rare, if a prison official was bent on violating a prisoner's Eighth Amendment rights, the fact that the prisoner participated in a voluntary program would be of little significance. For example, if, as part of his voluntary employment, prison officials forced a prisoner to ingest LSD, *see United States v. Stanley*, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987), or exposed him to high levels of nuclear radiation without protective equipment, *see Jaffee v. United States*, 663 F.2d 1226 (3d Cir.1981) (*en banc*), *cert. denied*, 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982), the "voluntary" nature of the employment would not affect our Eighth Amendment analysis.

Bagola, the non-moving party. *See, e.g., O'Connor v. DePaul Univ.*, 123 F.3d 665, 669 (7th Cir.1997). Summary judgment is appropriate if the evidentiary record indicates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c).

## A. Eighth Amendment Liability for "Failure to Protect"

 The Eighth Amendment's prohibition against "cruel and unusual punishments" does not only restrain affirmative conduct, such as prison officials' use of excessive force against prisoners. *See, e.g., Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). It also imposes a duty upon prison officials to provide humane conditions of confinement and to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (quotation omitted). In *Farmer*, the Supreme Court reiterated the standards of liability for "failure to protect" cases: "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828, 114 S.Ct. at 1974. *Farmer* clarified that "deliberate indifference" requires a showing of the official's subjective awareness of the risk: "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Id.* at 847, 114 S.Ct. at 1984. Although prison officials need not intend that a known risk will actually harm an inmate, they must intentionally ignore this known risk in order to be liable under the Eighth Amendment. *See id.* at 842, 114 S.Ct. at 1981–82; *see also Pavlick v. Mifflin*, 90 F.3d 205, 208 (7th Cir.1996). While ordinary negligence is therefore insufficient to establish liability, *see Langston v. Peters*, 100 F.3d 1235, 1238 (7th Cir.1996), prison officials cannot take refuge in *Farmer's* subjective test by deliberately ignoring obvious risks: "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* at 842, 114 S.Ct. at 1981–82. Accordingly, deliberate indifference is akin to criminal recklessness. *See Farmer*, 511 U.S. at 836–37, 114 S.Ct. at 1978–79.

 Because the Eighth Amendment proscribes cruel and unusual *punishments*, even a prison official's subjective awareness of a substantial risk of harm, and an ensuing injury, may be insufficient to establish liability. A prison official's duty under the Eighth Amendment is not to provide complete safety; it is to ensure "reasonable safety." *See Farmer*, 511 U.S. at 844, 114 S.Ct. at 1982–83; *see also Helling v. McKinney*, 509 U.S. 25, 33, 113 S.Ct. 2475, 2480–81, 125 L.Ed.2d 22 (1993). Therefore, reasonable measures taken to avert known risks will insulate a prison official from Eighth Amendment liability, even if those measures proved unsuccessful. *See Farmer*, 511 U.S. at 844, 114 S.Ct. at 1982–83; *see also Lewis v. Richards*, 107 F.3d 549, 556 (7th Cir.1997) (Flaum, J., concurring). This standard takes on added significance when applied to a prisoner's work-related *Bivens* claim, since industrial settings sometimes give rise to tragic injuries such as Bagola's. However, it is not the injury itself that gives rise to a *Bivens* claim. Rather, in such cases courts must scrutinize whether prison officials acted or failed to act with a sufficiently culpable state of mind, in order to determine whether a prisoner's injury was the result of punishment or a tragic accident.

## B. Summary Judgment in Bagola's Case

 Against this legal backdrop, and viewing the evidence in the light most favorable to Bagola, we agree with the district court that the evidence in this case creates an inference of nothing more than simple negligence. Bagola points to three justifications in support of his argument that the appellees acted with deliberate indifference towards his safety. He argues, in essence, that the 1990 OSHA violations put the appellees on notice regarding the danger of the Whitten machines; that they knew, prior to receiving the subsequent citations on October 16, 1991, a day after Bagola's injury, that the

hazards had not been abated; and that despite this knowledge, and in contradiction to their written policies, the appellees required Bagola to work around the Whitten machines while they were in operation. We address these contentions in turn.

While Bagola argues that the appellees were aware, prior to his accident, that the risks in the UNICOR factory had not been abated, he points to no evidence in the record that would permit such an inference. *See* FED.R.CIV.P. 56(e) (requiring an adverse party to "set forth specific facts showing that there is a genuine issue for trial"). Instead, the evidence indicates that following the OSHA citation resulting from Antonio's September 1990 visit, the appellees, through Safety Manager Vastlik, took measures that they believed were reasonable and effective in abating the risks identified by Antonio. Vastlik reported, in his January 15th memorandum, that the risks "had been abated," and Bagola presents no evidence indicating that the appellees knew otherwise. Although subsequent events demonstrated that this belief was incorrect, such misapprehension is insufficient by itself to support the inference of subjective intent required by the Eighth Amendment. *See Farmer*, 511 U.S. at 838, 114 S.Ct. at 1979 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.").

Second, the 1991 OSHA violations do not support an inference of the appellees' deliberate indifference. While Antonio's inspection occurred on August 27, then-Warden Kindt did not receive the OSHA citations until October 21, six days after Bagola's accident. Bagola has not disputed Appellee Tracy's declaration that the violations were not revealed by OSHA at any time prior to the October 16th letter. *See supra* note 4. The evidence indicates that at the time of Bagola's injury, the appellees were operating under the assumption, created by Vastlik's memorandum, that the violations had been abated. Because Bagola must prove that the appellees' subjective knowledge at the time of his accident was sufficiently culpable to support his Eighth Amendment claim, evidence of subsequent violations does not help him. Instead, even when viewing the evidence in the light most favorable to Bagola, the evidence indicates continuous, reasonable efforts taken by the appellees to ensure worker safety at the UNICOR factory.

Even after the modifications made by Vastlik in response to the 1990 citations, a dialogue between UNICOR officials and OSHA continued. Prison officials did not act with defiance towards OSHA officials; instead, they continued to correspond with OSHA and to discuss further measures to improve worker safety. This continuing dialogue is demonstrated by the October 11th letter from OSHA to Vastlik discussing the videotape sent to OSHA by Tracy. While Bagola argues that this videotape creates an inference of the appellees' knowledge of the serious risks posed by the Whitten machines, we do not agree. If anything, we view the videotape as evidence of the appellees' continued efforts to abate any risks that may have remained in an inherently dangerous industrial setting.

Further, Bagola was required to attend frequent safety meetings and to sign a job safety analysis recognizing that he was not to work around machines that were in operation. Although Bagola claims that he was, in fact, required to work around machines that were in operation, this dispute does not create a genuine issue of material fact. Bagola has presented no evidence that any of the appellees *knew* that he was required to work in this manner, or that they in fact required him to do so. Instead, the record reflects only that the appellees, as factory officials, required Bagola to attend frequent safety meetings and to observe the safety procedures provided in the job analysis. Such evidence does not create an inference that the appellees were deliberately indifferent to Bagola's safety.

In sum, the appellees may not have acted as quickly as possible to abate all risks, and they may even have acted negligently. However, such facts do not rise to the level of constitutional significance simply because this industrial accident occurred within prison walls. The Eighth Amendment requires the appellees to take "reasonable steps" to

648

ensure "reasonable safety", *see Farmer*, 511 U.S. at 844, 114 S.Ct. at 1982–83. Such reasonable steps may insulate a prison official from liability, "even if the harm ultimately was not averted." *Id.* Since the evidence indicates that the appellees acted reasonably in attempting to prevent accidents at the UNICOR factory, we cannot say that they acted with deliberate indifference towards Bagola's safety.[19]

### Conclusion

Because 18 U.S.C. § 4126 does not provide procedural safeguards that adequately protect Bagola's Eighth Amendment rights, we hold that the district court properly assumed jurisdiction over Bagola's *Bivens* claim. However, the evidence presented fails to create a genuine issue regarding whether the appellees acted with deliberate indifference towards Bagola's safety. Therefore, we affirm the district court's entry of summary judgment in favor of the appellees.

---

**19.** *Because we conclude that the subjective, deliberate indifference required under Farmer was not established by the evidence in this case, we need not address whether the conditions in the* UNICOR factory were objectively, "sufficiently serious" to implicate Eighth Amendment scrutiny. *See* 511 U.S. at 834, 114 S.Ct. at 1977.