**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 12, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENK CIRCUIT

BIG CATS OF SERENITY SPRINGS,
INC., doing business as Serenity
Springs Wildlife Center; NICK
SCULAC; and JULES INVESTMENT,
INC.,

        Plaintiffs - Appellees,

and

JULIE WALKER,

        Plaintiff,

    v.

CINDY RHODES; and TRACY
THOMPSON,

        Defendants - Appellants.

and

THOMAS J. VILSACK, in his official
capacity as Secretary of Agriculture;
and OTHER UNNAMED UNITED
STATES DEPARTMENT OF
AGRICULTURE EMPLOYEES,

        Defendants.

No. 15-1174

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:13-CV-03275-REB-KLM)**

Edward Himmelfarb, Appellate Staff Attorney, Civil Division (Benjamin C. Mizer, Principal Deputy Assistant Attorney General, John F. Walsh, United States Attorney for the District of Colorado, and Barbara L. Herwig, Appellate Staff Attorney, Civil Division, with him on the briefs), United States Department of Justice, Washington, DC, for Appellants.

Duston K. Barton (Leonard H. MacPhee with him on the brief), Perkins Coie LLP, Denver, Colorado, for Appellees.

---

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **PHILLIPS**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

Big Cats of Serenity Springs is a Colorado-based non-profit that provides housing, food, and veterinary care for exotic animals. The facility is regulated by the United States Department of Agriculture's Animal and Plant Health Inspection Service (APHIS), established pursuant to the Animal Welfare Act. Three APHIS inspectors accompanied by El Paso County sheriff's deputies broke into the Big Cats facility without its permission to perform an unannounced inspection of two tiger cubs. But at the time the inspectors entered the facility, the cubs were at a veterinarian's office receiving treatment, just as Big Cats had promised the APHIS inspectors the previous day.

Big Cats and its directors sued the APHIS inspectors for the unauthorized entry pursuant to *Bivens v. Six Unknown Narcotics Agents*, 403 U.S. 388 (1971) and 42 U.S.C. § 1983, asserting the entry was an illegal search under the Fourth Amendment. The district court denied the APHIS inspectors' motion to dismiss

the complaint and they filed an interlocutory appeal challenging the court's failure to grant qualified immunity. This court has jurisdiction over the interlocutory appeal from the district court's order under 28 U.S.C. § 1291. *See Mitchell v. Forsyth*, 472 U.S. 511, 535 (1985). Additionally, the court has jurisdiction over the question of whether a *Bivens* remedy exists because it was sufficiently implicated by the qualified immunity defense. *See Wilkie v. Robbins*, 551 U.S. 537, 549 n.4 (2007).

We affirm in part and reverse in part. Big Cats' complaint has stated a claim for relief under *Bivens*. No APHIS inspector would reasonably have believed unauthorized forcible entry of the Big Cats facility was permissible, and therefore Big Cats and its directors may have a claim for violation of their Fourth Amendment right to be free from an unreasonable search. But we reverse on Big Cats' civil rights claim because the federal inspectors are not liable under § 1983 in the circumstances here.

## I. Background

We start by explaining the regulatory scheme that applies to Big Cats' business and then address the relevant factual and procedural background.

*A. The Animal Welfare Act*

Big Cats is a licensed wild animal exhibitor under the Animal Welfare Act, 7 U.S.C. §§ 2131–59 (AWA). Under the AWA, a facility must meet care and sanitation standards issued by the United States Department of Agriculture (USDA). 7 U.S.C. § 2143(a). Among other things, the regulations require licensees to handle animals safely, 9 C.F.R. § 2.131, provide adequate veterinary care, *id.* at § 2.40, and mark animals for identification, *id.* at § 2.50.

To enforce these standards, the AWA authorizes the USDA to "make such investigations or inspections as [the USDA] deems necessary." 7 U.S.C. § 2146(a). It grants the USDA access to licensees' facilities, animals, and records "at all reasonable times." *Id.* The corresponding regulations require a licensed organization to allow inspectors "during business hours . . . to enter its place of business . . . [and] inspect and photograph the facilities, property and animals, as the APHIS officials consider necessary to enforce the provisions of the Act . . . ." 9 C.F.R. § 2.126.

Violations by licensees, whether by providing substandard care or refusing inspection, are sanctioned through an administrative process. 7 U.S.C. § 2149. Licensees are subject to license suspension, civil penalties up to $10,000, and in some instances, imprisonment for up to one year. *Id.* Licensed organizations can appeal a final order to a federal Court of Appeals to "enjoin, set aside, suspend

(in whole or in part), or determine the validity of the Secretary's order." *Id.* at § 2149(c).

   *B. The Incident*

   The following allegations are from Big Cats' complaint, and we take them as true for purposes of our analysis. *Weise v. Casper*, 507 F.3d 1260, 1269–70 (10th Cir. 2007).

   After a routine inspection of Big Cats' Serenity Springs Wildlife Center in early April 2013, APHIS inspectors determined that the care of an injured tiger cub was substandard and issued a citation requiring Big Cats to provide veterinary care. But when an inspector conducted a follow-up visit the next week, she found that the injury had worsened, and issued another citation. Big Cats denied both allegations and contested both citations, claiming they were part of a "pattern of harassing behavior" by the inspectors. App. 51.

   On May 6, APHIS inspectors conducted another follow-up inspection. The inspectors claimed the cub's injuries had worsened, and also noticed that a different cub was suffering from an injured hind leg. Although Big Cats claimed the cubs had been treated and were receiving appropriate medications, the inspectors again cited Big Cats for failure to use "appropriate methods to prevent, control, diagnose, and treat diseases and injuries." 9 C.F.R. § 2.40(b)(2). The inspectors required the cubs to be evaluated as soon as possible, but "not later than 8:00 AM on 5/7/2013." App. 37.

During the inspection, Big Cats' founder and director, Nick Sculac, asked whether the cubs could be examined on May 8, because he had already scheduled an in-facility visit for that day with his contract veterinarian. But the APHIS officials would not approve a one-day delay. So even though transportation to a clinic risked further injury according to two of Big Cats' contract veterinarians, it was Mr. Sculac's only option to meet the citation's 8:00 a.m. requirement. He arrived, with the cubs, at the veterinary clinic at 7:00 a.m. on May 7.

Meanwhile, around 8:00 a.m., three APHIS personnel arrived at the Serenity Springs Wildlife Center only to find the facility closed. After unsuccessfully trying to reach Mr. Sculac on his cell phone, the inspectors decided to forcibly enter the facility. They contacted the El Paso County Sheriff's Office at 8:45 a.m., requesting urgent assistance in entering the facility. Two sheriff's deputies arrived at the facility and were told by the inspectors that they had a court order to seize the cubs. The deputies cut the outer gate's chains, and the inspectors entered the facility. They then cut the locks off an inner gate to access the pens, where they encountered an employee. The employee was "shocked and alarmed to suddenly see three [APHIS personnel] and two heavily armed police officers appear inside the locked, private facility." App. 17. After she informed them the cubs were at the veterinary clinic, the inspectors left and went to the clinic.

*C. Procedural History*

-6-

Big Cats and its directors filed a lawsuit against the APHIS inspectors, alleging a Fourth Amendment *Bivens* claim and a statutory claim under 42 U.S.C. § 1983.  The district court denied the government's motion to dismiss, concluding the inspectors were not entitled to qualified immunity because their conduct—forcible entry without permission—violated clearly established Fourth Amendment constitutional law.  The inspectors bring this interlocutory appeal from the denial of qualified immunity.

## II.  Analysis

The government makes two arguments: first, it contends neither *Bivens* nor § 1983 apply to the APHIS inspectors' unauthorized entry into Big Cats' facility; and, second, even if the inspectors' conduct was unlawful, it argues that the inspectors are still entitled to qualified immunity because the violation was not clearly established under federal law.

Since this is the denial of a Rule 12(b)(6) motion, our review is de novo, accepting "all well-pleaded allegations 'of the complaint as true and consider[ing] them in the light most favorable to the nonmoving party.'"  *Butler v. Rio Rancho Pub. Sch. Bd. of Educ.*, 341 F.3d 1197, 1199 (10th Cir. 2003) (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999)).  "To survive a motion to dismiss, a complaint must allege facts that, if true, 'state a claim to relief that is plausible on its face.'  A claim is facially plausible when the allegations give rise to a reasonable inference that the defendant is liable."

*Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016) (quoting *Wilson v. Montano*, 715 F.3d 847, 852 (10th Cir. 2013)). In the context of qualified immunity, we may not dismiss a complaint for failure to state a claim unless it appears beyond doubt that plaintiffs cannot prove a set of facts that would entitle them to relief. *Id.*

We address the *Bivens* and § 1983 claims in turn.

*A.* Bivens

The government first contends that a *Bivens* cause of action is not available under the Animal Welfare Act. It argues a *Bivens* remedy is not available where the AWA provides parties with an alternative remedy for misconduct. But as we explain, the AWA does not allow forcible entry to a licensee's facility, nor does it provide licensees any relief from such conduct. A *Bivens* claim is Big Cats' only available relief for an unconstitutional search of its premises.

The Constitution does not ordinarily provide a private right of action for constitutional violations by federal officials. Nonetheless, the Supreme Court in *Bivens* approved a judicially-implied cause of action allowing individuals to seek damages for unconstitutional conduct by federal officials. 403 U.S. 388 (1971). According to the Court, "[t]hat damages may be obtained for injuries consequent upon a violation of the Fourth Amendment by federal officials should hardly seem a surprising proposition." *Bivens*, 403 U.S. at 395. "'[I]t is well settled that where legal rights have been invaded, and a federal statute provides for a general

right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.'" *Id.* at 396 (alterations omitted) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)).

In several cases following *Bivens*, the Supreme Court extended the doctrine from the Fourth Amendment context to other types of constitutional claims. In *Davis v. Passman*, 442 U.S. 228 (1979), the Court held that a federal Congressional employee could bring a *Bivens* action pursuant to the "equal protection" element of the Due Process clause of the Fifth Amendment. *See id.* at 248–49. And then in *Carlson v. Green*, 446 U.S. 14 (1980), the Court allowed the plaintiffs to pursue a *Bivens* claim against federal prison officials for failure to provide adequate medical treatment in violation of the Eighth Amendment's cruel and unusual punishment clause. *See id.* at 17–18.

*Davis* and *Carlson* represent the high-water mark in the Court's *Bivens* jurisprudence. Since those cases, the Court has steadfastly retreated from a broad application of the doctrine, refusing to extend implied causes of action to other constitutional provisions, and cabining the contexts in which it will allow *Bivens* claims to proceed. *See* Richard H. Fallon, Jr. et al., Hart & Wechsler's The Federal Courts and the Federal System 770–72 (7th ed. 2015); *see also Correctional Serv. Corp v. Malesko*, 534 U.S. 61, 66–71 (2001) (collecting cases). The Court recognizes that a judicially-implied cause of action risks infringing on Congress's power to make law, and has explained that

-9-

> any freestanding damages remedy for a claimed constitutional violation [based on *Bivens*] has to represent a judgment about the best way to implement a constitutional guarantee; it is not an automatic entitlement no matter what other means there may be to vindicate a protected interest, and in most instances we have found a *Bivens* remedy unjustified.

*Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). Thus, where Congress has already constructed a "constitutionally adequate" alternative remedy for federal misconduct, courts ought not step in by implying a *Bivens* cause of action. *See Bush v. Lucas*, 462 U.S. 367, 379 n.14 (1983) (declining to find new substantive legal liability to permit federal employee to recover damages from his supervisor after supervisor improperly disciplined him for exercising his First Amendment rights); *see also Correctional Serv. Corp. v. Malesko*, 534 U.S. 61 (2001) (claims against private prisons); *FDIC v. Meyer*, 510 U.S. 471 (1994) (claims against federal agencies); *Schweiker v. Chilicky*, 487 U.S. 412, 425 (1988) (Fifth Amendment claim against former government officials arising out of delays in receipt of Social Security benefits); *United States v. Stanley*, 483 U.S. 669 (1987) (declining to extend *Bivens* remedies to harms arising out of military service); *Chappell v. Wallace*, 462 U.S. 296 (1983) (same).

Yet *Bivens* still remains available in some circumstances, and our circuit has allowed *Bivens* claims in a variety of factual scenarios—based on violations of the First, Fourth, and Eighth Amendments. *See Smith v. United States*, 561 F.3d 1090 (10th Cir. 2009) (Eighth Amendment claim against prison officials);

*Oxendine v. Kaplan*, 241 F.3d 1272 (10th Cir. 2001) (same); *Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521 (10th Cir. 1994) (First and Fourth Amendment claims against IRS agents).

Nonetheless, the Supreme Court requires courts evaluating *Bivens* causes of action to carefully consider the facts and context. The analysis proceeds along a two-step analytical framework. First, we examine whether an "alternative, existing process for protecting the [plaintiff's] interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550. Second, in the absence of an alternative remedy, we will consider whether "special factors" counsel hesitation before authorizing a new kind of federal litigation. *Id.* In evaluating this consideration, courts "weigh[] reasons for and against the creation of a new cause of action, the way common law judges have always done." *Id.* at 554.

Relying on these principles, the government contends the AWA provides a comprehensive "alternative, existing process" that protects Big Cats' constitutional interests and therefore counsels against an implied *Bivens* cause of action. It argues that because Big Cats may administratively challenge an adverse inspection report, it must therefore resolve any alleged Fourth Amendment claims through that process. Moreover, the government contends that even if the AWA does not provide a fully adequate remedial scheme, special factors weigh against a *Bivens* claim here.

-11-

We consider each argument in turn.

### 1. Alternative Remedy

The Supreme Court has explained that where an "'alternative, existing process' [is] capable of protecting the constitutional interests at stake," the courts should refrain from augmenting the process with an implied damages remedy. *Minneci v. Pollard*, 132 S. Ct. 617, 623 (2012) (quoting *Wilkie*, 551 U.S. at 550). "The point of examining the existing process is to determine whether Congress has explicitly or implicitly indicated 'that the Court's power should not be exercised.'" *De La Paz v. Coy*, 786 F.3d 367, 375 (5th Cir. 2015), *cert. filed*, (Jan. 12, 2016) (quoting *Bush*, 462 U.S. at 378). Congress may explicitly "indicate its intent[] by statutory language, by clear legislative history, or perhaps even by the statutory remedy itself, that the Court's power should not be exercised." *Bush*, 462 U.S. at 378. But Congress may also *implicitly* indicate intent "by creating a process that provides 'an avenue for some redress'" for injured persons, and "[i]n these instances, 'bedrock principles of separation of powers' show that 'Congress expected the Judiciary to stay its *Bivens* hand' and instead apply the statutory remedy." *Koprowski v. Baker*, 822 F.3d 248, 262 (6th Cir. 2016) (Sutton, J., dissenting) (quoting *Malesko*, 534 U.S. at 69; *Wilkie*, 551 U.S. at 554). Thus, in analyzing whether a *Bivens* claim is precluded by an alternative remedy, courts must consider the nature and extent of the statutory scheme created by Congress, and assess the significance of that scheme in light of the factual background of

-12-

the case at hand.  *See Wilkie*, 551 U.S. at 551; *see also De La Paz*, 786 F.3d at 375.

Several cases illustrate this analysis.  For example, in *Minneci* the Court considered whether prisoners could bring a *Bivens* claim against employees of a privately owned federal prison.  The Court found no right of action because a claim "for physical or related emotional harm suffered as a result of [inadequate medical care is] the kind of conduct that state tort law typically forbids."  132 S. Ct. at 624.  Because state tort law provided "roughly similar incentives for potential defendants to comply with the Eighth Amendment while also providing roughly similar compensation to victims," the plaintiff had adequate recourse under state tort law.  *Id.* at 625.  *See also Davis*, 442 U.S. at 245 n.23 (no state law remedy available).  Similarly, in the Fifth Amendment context, the Court determined that Title II of the Social Security Act is a constitutionally adequate substitute for a Due Process challenge based on wrongful termination of disability benefits.  Even though the Act did not provide full compensatory relief, Congress had sufficiently "addressed the problems created by state agencies' wrongful termination of disability benefits," making a *Bivens* remedy unnecessary. *Schweiker*, 487 U.S. at 429.[1]

---

[1] The Court suggested an Eighth Amendment *Bivens* claim would be permitted in *Malesko*, 534 U.S. at 70, because a prisoner may lack "any alternative remedy" for harms caused by a federal prison officer's unconstitutional conduct.

But in the prototypical Fourth Amendment context, the Court has so far rejected the notion that state tort law can adequately protect a citizen's "absolute right to be free from unreasonable searches." *Bivens*, 403 U.S. at 392. According to the Court, the Fourth Amendment proscribes a broader range of conduct than what state law typically condemns, and, moreover, state law in some cases may be "inconsistent or even hostile" to the interests protected by the Fourth Amendment. *Bivens*, 403 U.S. at 392–94; *see also id.* at 410 (Harlan, J., concurring in the judgment) ("For people in Bivens' shoes, it is damages or nothing.").[2]

The government does not rely on state law as an alternative source of relief for Big Cats. Instead, it argues that we should conclude Congress has designed a comprehensive statutory scheme that provides meaningful remedies for victims, such that a *Bivens* remedy is unwarranted. It contends the regulatory scheme need not provide "complete relief," but should reflect Congress's meaningful intention to "provide[] what it considers adequate remedial mechanisms for constitutional violations that may occur in the course of [the statute's] administration." *Schweiker*, 487 U.S. at 423. Under the AWA, a licensee may administratively challenge an adverse inspection report under the Administrative

---

[2] One court recently found Congress supplanted an implied Fourth Amendment *Bivens* remedy. In *De La Paz*, 786 F.3d at 377, the Fifth Circuit found Congress supplanted Fourth Amendment claims in the immigration context where: (1) illegally seized evidence could be suppressed in deportation hearings; (2) the government had a process for reviewing alleged Fourth Amendment violations by employees; and (3) Congress has enacted an "elaborate remedial system" of immigration laws that has been in place for decades.

Procedure Act.[3]  Thus, the government maintains that even though the AWA has no express compensatory mechanism to remedy constitutional claims, a Fourth Amendment claim is "*capable* of being addressed in the remedial process" by way of rejection of inspection violations predicated on illegal conduct.  Reply Br. at 10 (emphasis added).

This reading of the AWA seriously misconstrues its regulatory scope and is not faithful to the Supreme Court's case law considering alternative remedies. The Court tells us the operative "question [is] whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Wilkie*, 551 U.S. at 550.  In other words, the appropriate consideration is whether an alternate, existing process demonstrates Congress's *intent* to exclude a damages remedy.  *Schweiker*, 487 U.S. at 435.  Evidence of that intent would be a scheme that provides adequate deterrence of constitutional violations and at least *some* form of relief for the harm.  *Malesko*, 534 U.S. at 70.

---

[3] Licensees may then challenge a final agency action under the APA.  7 U.S.C. § 2149(c) ("Any dealer, exhibitor, research facility, intermediate handler, [or] carrier . . . aggrieved by a final order of the Secretary issued pursuant to this section may, within 60 days after entry of such an order, seek review of such order in the appropriate United States Court of Appeals in accordance with the provision of sections 2341, 2343 through 2350 of Title 28, and such court shall have exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part) or to determine the validity of the Secretary's order.").

But Big Cats' challenge is based on a violation of the constitutional right to be free from an unreasonable search, not the propriety of the licensing citation. Nor does the AWA appeals process provide a mechanism for relief for misconduct by inspection agents themselves, it only allows for a licensee to challenge the factual basis for the citation—here Big Cats' failure to "allow APHIS officials access to conduct inspections." App. 91; *see also* Aple. Br. 28–29 (citing United States Dep't of Agric., *Animal Care: Appeals Process* (2014) (demonstrating grounds for appeal with no mechanism to assert constitutional violations)). In fact, should an APHIS inspector unlawfully enter and search a business, but find nothing to cite, that business would have no basis to challenge the inspector's behavior. Moreover, while it is true that judicial review under the APA may, in some circumstances, foreclose a *Bivens* claim,[4] even if we accept the

---

[4] *Compare W. Radio Serv. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009) ("[T]he design of the APA raises the inference that Congress 'expected the Judiciary to stay its *Bivens* hand [for process based challenges to agency action]." (citation omitted)); *and Miller v. U.S. Dep't of Agric. Farm Serv. Agency*, 143 F.3d 1413, 1417 (11th Cir. 1998) (holding that plaintiff's right to judicial review under the APA precluded him from bringing *Bivens* action), *with Munsell v. Dep't of Agric.*, 509 F.3d 572, 591 (D.C. Cir. 2007) (suggesting a hard-line rule that the existence of APA review precludes plaintiff from seeking *Bivens* remedy "make[s] little sense" in some circumstances, such as when defendant's unconstitutional conduct removed plaintiff from regulated arena, making APA review unavailable); *and Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 70 (D.D.C. 2009) ("Neither the Supreme Court nor the D.C. Circuit has ever held that the APA precludes the availability of a *Bivens* remedy."). *But see Sell v. United States*, 539 U.S. 166, 193 (2003) (Scalia, J., dissenting) (suggesting that *Bivens* remedy is not precluded by availability of APA review) ("Petitioner could have obtained pre-trial review . . . by filing suit
(continued...)

-16-

government's characterization of the existing AWA administrative scheme, we fail to see the APA as an "'alternative, existing process' capable of protecting the constitutional interests at stake." *Minneci*, 132 S. Ct. at 623 (citation omitted). While there is no need for congruent remedies or even money damages to deny a *Bivens* remedy, there must be more than nothing. Here, the AWA and administrative review provide no relief for the conduct alleged by Big Cats.

Even if the AWA provided some form of alternative relief, it would be hard to square this case with circuit precedent. In *Smith v. United States*, 561 F.3d 1090, 1103 (10th Cir. 2009), we found Congress had not displaced a *Bivens* remedy based on an Eighth Amendment claim even where a statutory scheme substantially occupied the field of inmate injury. We concluded the Inmate Accident Compensation Act (IACA), which provides compensation for federal inmates who suffer work-related injuries, did not provide an adequate remedial scheme, since the IACA operates a no-fault compensation system that provided no "'forum where the allegedly unconstitutional conduct would come to light.'" *Smith*, 561 F.3d at 1103 (quoting *Bagola v. Kindt*, 131 F.3d 632, 642–43 (7th Cir. 1997)); *see also Koprowski*, 822 F.3d at 255 ("Under the [IACA] scheme, all that matters is the nature of the injury, not the underlying conduct."). In finding such a system offers "very little deterrent effect for constitutional harms," we held the

[4](...continued)
under the [APA], *or even* by filing a *Bivens* [] action.") (emphasis added) (citation omitted)).

-17-

IACA did not provide an adequate, alternative process to protect prisoners' Eighth Amendment rights. *Smith*, 561 F.3d at 1103; *see also Koprowski*, 822 F.3d at 252; *Bagola*, 131 F.3d at 644; *Vaccaro v. Dobre*, 81 F.3d 854, 857 (9th Cir. 1996) (same).

If anything, the scheme in *Smith* offered a more meaningful remedy for plaintiffs to redress their injuries than the AWA does in this case. *See Koprowski*, 822 F.3d at 264 (Sutton, J., dissenting) ("Taken together, these [IACA] alternatives allow an injured inmate to receive money for the injury *and* order the officials to obey the Constitution, demonstrating that Congress paid 'careful attention' to this precise injury. . . . They also offer injured inmates extensive review procedures, which further 'safeguard their rights.'" (alteration and citation omitted)). In this case, unlike the IACA, the AWA provides no compensatory mechanism for unconstitutional conduct, whether it be damages or dismissal of inspection violations. And even if unconstitutional searches were exposed, the appeals process does not describe any recourse. The only recourse the government suggests is that evidence improperly gathered would be ruled impermissible to support a citation. But the citation for failure to provide access is not ameliorated by inspectors' subsequent conduct—no evidence was gathered. Putting aside that no remedy appears in the statute, regulations, or in internal administrative guidance, even if it did, the government does not explain how the exclusion of evidence provides accountability, or—in other words—gives APHIS

-18-

officials "skin in the game" to deter illegal conduct. *See Koprowski*, 822 F.3d at 255. In short, because nothing in the AWA provides licensees protection from Fourth Amendment violations in the circumstances alleged here, we cannot hold that an alternative, existing process excludes a *Bivens* remedy.

### 2. Special Factors

The Supreme Court also counsels that a *Bivens* action is not available where the government demonstrates "special factors" that weigh against an implied remedy. This requires "weighing reasons for and against the creation of a new cause of action, the way common law judges have always done," and whether those reasons "counsel[] hesitation before authorizing a new kind of federal litigation." *Wilkie*, 551 U.S. at 550, 554.

*Wilkie* again is illustrative. There, the Court found the risk of a floodgate of spurious claims against BLM officials would undermine the functioning of the agency, as well as the elusive nature of the proposed cause of action counseled hesitation: "We think accordingly that any damages remedy for actions by Government employees who push too hard for the Government's benefit may come better, if at all, through legislation." *Id.* at 562.

The Court similarly found special factors precluded a *Bivens* action in *Chappell*, where the Court held that "the unique disciplinary structure of the Military Establishment and Congress' activity in the field constitute 'special factors' which dictate that it would be inappropriate to provide enlisted military

-19-

personnel a *Bivens*-type remedy against their superior officers."  462 at 304; *see also Schweiker* at 414 (finding that design of the Social Security Act's administrative and judicial scheme was a special factor counseling against finding a *Bivens* remedy).  In *Bush*, the Court also rejected a *Bivens* remedy for the plaintiff's First Amendment violation on the basis of a special factors analysis, because the case involved policy questions in an area that had received significant congressional scrutiny.  *Id.* at 423.

Here, the government argues that the animal inspection context militates against a *Bivens* remedy because the AWA already provides a series of remedies.  Aplt. Br. at 26.  But as we explained above, the AWA does not provide an adequate remedy for illegal searches.  Additionally, this is not the case where "indications [of] congressional inaction" support an inference that the *Bivens* action has been supplanted.  *Chilicky*, 487 U.S. at 423.  APHIS inspectors are not subject to a comprehensive disciplinary scheme crafted by Congress or the Executive Branch.  Nor are there any concerns about a workable cause of action.  Fourth Amendment *Bivens* causes of action have been routinely applied to the conduct of federal officials in a variety of contexts, including ATF agents, *Groh v. Ramirez*, 540 U.S. 551 (2004); federal marshals and FBI agents, *Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997); and IRS special agents, *Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521 (10th Cir. 1994).

*      *      *

If we were writing on a blank slate, we might be persuaded that *Bivens* is a relic of another era, and that Congress is perfectly capable of policing federal misconduct. But given our case law, Supreme Court precedent, and the factual context present here, we are constrained to find that Big Cats may proceed. Big Cats alleges a garden-variety constitutional violation (hardly a new context), the regulatory scheme is plainly unavailable to remedy the alleged misconduct, and no special factors place AWA inspectors outside *Bivens*. We therefore agree with the district court that Big Cats' *Bivens* claim may go forward unless the inspectors are entitled to qualified immunity.

*3. Qualified Immunity*

Public officials enjoy "qualified immunity in civil actions that are brought against them in their individual capacities and that arise out of the performance of their duties." *Pahls v. Thomas*, 718 F.3d 1210, 1227 (10th Cir. 2013). To overcome qualified immunity, a plaintiff must show that: (1) the public official violated the plaintiff's constitutional rights; and (2) these rights were clearly established at the time of the alleged violation. *Id.* "This standard, by design, 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)). Although the purpose of a *Bivens* action is to deter individual federal officers from committing constitutional violations, "the threat of litigation and liability will adequately deter federal officers for *Bivens*

-21-

purposes no matter that they may enjoy qualified immunity." *Malesko*, 534 U.S. at 70.

We first discuss the contours of a Fourth Amendment violation in the regulatory context and then consider whether the law was clearly established so that a reasonable APHIS inspector would have known he could not forcibly enter the Serenity Springs Wildlife Center without authorization.

### a. Constitutional Violation

The Fourth Amendment protects the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

It is well established that the Fourth Amendment applies not only to private homes and individuals, but also to commercial premises. *New York v. Burger*, 482 U.S. 691, 699 (1987). An owner or operator of a business thus has a reasonable expectation of privacy in commercial property, *see id.* at 702; *see also Katz*, 389 U.S. 360–62 (Harlan, J., concurring), and that expectation includes not only traditional police searches, but also administrative inspections to enforce regulations, *Burger*, 482 U.S. at 699.

The Supreme Court has recognized, however, that an expectation of privacy in commercial property is "different from, and indeed less than, a similar expectation in an individual's home." *Id.* at 700. The expectation of privacy is particularly low for the narrow class of heavily or "closely regulated" businesses —such as those that sell firearms and liquor—because the business owner has voluntarily decided to "subject himself to a full arsenal of governmental regulation." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978). Without elaborate enforcement schemes, the regulation of those industries would be ineffective. Thus, for closely regulated businesses, warrantless administrative searches of commercial premises—including surprise inspections—do not *per se* violate the Fourth Amendment. *See* 5 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 10.2(f) (5th ed. 2012); 2 William E. Ringel, Searches and Seizures, Arrests and Confessions § 14:8 (2d ed. Nov. 2016 Update).

A closely regulated industry is still protected by the Fourth Amendment, however, and warrantless searches of those businesses are unreasonable if arbitrarily conducted. *See* Ringel, *supra*, § 14:8. To guard against unreasonable administrative searches, in *Burger* the Supreme Court articulated several criteria the government must meet to justify warrantless inspections: (1) the government must prove a *substantial interest* that justifies warrantless inspections; (2) the warrantless inspections must be *necessary to further the regulatory scheme*; and

(3) the inspection program must be *sufficiently certain and regular* to provide a constitutionally adequate substitute for a warrant. *Burger*, 482 U.S. at 702–03; *see also United States v. Mitchell*, 518 F.3d 740, 751 (10th Cir. 2008) (applying the *Burger* three-part test).

We assume the AWA fits within the analytical framework of *Burger*, an assumption Big Cats does not challenge. The government has a substantial interest in animal safety and welfare and surprise inspections help further those interests. And the regulations implementing the AWA allow routine inspections of regulated premises during "business hours" with protections for businesses to have the inspections conducted by authorized personnel. 9 C.F.R. § 2.126(a).

But the fact that the AWA might authorize warrantless inspections is not the end of the story. The question remains as to whether government officials may *forcibly* enter commercial premises in pursuit of their regulatory duties.

The Supreme Court addressed this question in *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 77 (1970). In that case, the Court considered a situation in which an IRS agent suspected a tavern of violating federal liquor excise tax laws. After the owner denied access to a locked liquor storage room, the agent broke the lock and entered the room, finding illicit goods. The store owner sued, seeking to suppress the seized liquor as evidence of misconduct.

The Supreme Court held that the IRS agent violated the Fourth Amendment. In reaching this conclusion, the Court considered the government's

-24-

argument that the statutory scheme allowed tax inspectors to forcibly enter regulated premises.  The relevant statute allowed inspectors to: (1) "enter during business hours the premises (including places of storage) of any dealer for the purpose of inspecting or examining any records or other documents required to be kept,"  26 U.S.C. § 5146(b) (1964); and (2) "enter, in the daytime, any building or place where any articles or objects subject to tax are made, produced, or kept, so far as it may be necessary for the purpose of examining said articles," *id.* at § 7606.  The Court rejected the government's contention that the statute authorized breaking into closed facilities without a warrant, noting Congress's lack of explicit authorization to use force to further lawful inspections and the statutory provision for civil penalties for businesses refusing entry.  26 U.S.C. § 7342 (1964).

The government argues that although the AWA is silent about warrantless searches, rules promulgated under the AWA permit warrantless forcible entry under *Burger* and *Colonnade*.  Specifically, it points to the regulations governing the confiscation of animals as authority.  9 C.F.R. § 2.129.  Under these regulations, where an inspector believes an animal is "suffering" due to the exhibitor's failure to comply with USDA regulations, an APHIS official shall "notify the [] exhibitor . . . and request that the condition be corrected and that adequate care be given to alleviate the animal's suffering or distress."  9 C.F.R. § 2.129(a).  Then, if the exhibitor "refuses to comply with this request, the APHIS

official may confiscate the animal(s) for care, treatment, or disposal . . . if, in the opinion of the [APHIS] Administrator, the circumstances indicate the animals' health is in danger." *Id.* The regulations also provide APHIS officials with guidance in the case of entry in premises where the owner is unavailable. An inspector "shall [then] contact a local police or other law officer to accompany him to the premises and shall provide for adequate care when necessary to alleviate the animals' suffering." *Id.* at § 2.129(b).[5] The government argues that "authorization for forcible entry is implicit" in these regulations considering: (1) the local law enforcement provision; and (2) that inspectors would be unable to

---

[5] That provision states in relevant part that, where an APHIS official finds an animal is:

> (a) suffering as a result of a failure of the . . . carrier to comply with any provision of the regulations or the standards set forth in this subchapter, the APHIS official shall make a reasonable effort to notify the . . . carrier of the condition of the animal(s) and request that the condition be corrected and that adequate care be given to alleviate the animal's suffering or distress . . . . In the event that the . . . carrier refuses to comply with this request, the APHIS official may confiscate the animal(s) for care, treatment, or disposal as indicated in paragraph (b) of this section, if, in the opinion of the Administrator, the circumstances indicate the animal's health is in danger.
>
> (b) In the event that the APHIS official is unable to locate or notify the dealer, exhibitor, intermediate handler, or carrier as required in this section, the APHIS official shall contact a local police or other law officer to accompany him to the premises and shall provide for adequate care when necessary to alleviate the animal's suffering.

discharge their responsibilities unless authorized to forcibly enter a facility. Aplt. Br. at 40–41.

But § 2.129 does not apply here. By its plain language, the regulation applies to circumstances where: (1) the licensee "refuses to comply" with an official request to correct the animal's suffering; and (2) the APHIS administrator certifies that "the circumstances indicate the animal's health is in danger." 9 C.F.R. § 2.129(a). Here, the factual allegations in the complaint state that Big Cats never refused to comply with a request for care or that the inspectors sought and received an opinion from the APHIS Administrator that forcible entry was necessary.

In fact, according to the complaint, the inspectors themselves did not think they were engaged in a confiscation under this provision. In their internal report on the incident, they characterized their visit as a "routine inspection" and that they were denied access pursuant to the inspection regulation, App. 90–91, a regulation that only allows APHIS officials to enter a business to inspect records, photograph animals, and document noncompliance with the Act, 9 C.F.R. § 2.126(a). These regulations do not give a whiff of support for unannounced forcible entry of a business.

In sum, the AWA regulatory scheme is similar to the scheme that the Court found inadequate in *Colonnade* to protect constitutional rights. Absent statutory authorization, the inspectors had no basis to forcibly enter the establishment

without a warrant. Accordingly, Big Cats has adequately alleged that the APHIS inspectors' unauthorized entry violated their Fourth Amendment rights and that the AWA did not authorize the warrantless search.

*b. Clearly Established*

Under qualified immunity, even if the inspectors violated the Fourth Amendment, they are entitled to immunity if no clearly established law would have informed them that a warrantless forcible search was improper. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 131 S. Ct. at 2083 (alterations omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). But the plaintiff must show a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must supply the requisite notice. *Columbian Fin. Corp. v. Stork*, 811 F.3d 390, 396 (10th Cir. 2016).

*Colonnade* is squarely on point. The inspection provisions allowed access at reasonable times for surprise inspections but nowhere allowed or authorized the use of force. Moreover, both inspection schemes provided penalties to enforce compliance. For the tax statutes in *Colonnade*, Congress required a fine for any person "who refuses to admit any officer or employee of the Treasury Department" acting under the tax statute. Similarly, under the AWA, licensed

-28-

businesses face civil penalties up to $10,000 for violating the statute or corresponding regulations, thus obviating the need for forcible entry. 7 U.S.C. § 2149(b). Thus, the AWA's scheme is like that in *Colonnade*, which for fifty years has stood for the proposition that a warrant is required for forcible entry into closed premises.

The government argues the AWA goes further than the scheme in *Colonnade* or even *Burger*, making misconduct less obvious to inspectors. It contends, moreover, the regulations provide for forcible entry in cases of veterinary emergency to conduct a confiscation. As discussed above, where inspectors believe an animal is suffering and the exhibitor refuses to provide adequate care, the inspector may confiscate the animal if the APHIS Administrator determines the animal's health is in danger. 9 C.F.R. § 2.129(a). But, according to the complaint, at no point did Big Cats refuse to provide veterinary care, nor did the APHIS Administrator determine the tiger cubs were in danger. They also knew that both of Big Cats' contract veterinarians "believed [a] one-day delay [in examination] was preferable to transporting the animals," App. 53, obviating the basis to believe care was urgent. And, in any event, the inspectors did not rely on the confiscation regulations to justify their entry into the premises, which they described as a "routine inspection" in the report filed after the incident. It is also worth noting that neither the AWA regulations nor applicable Animal Care Inspection Guide suggest that forcible entry is a

-29-

permissible technique. *See* Supp. App. 2–19; Aplt. Br. at 27. In fact, the Guide instructs agents to "not enter facilities with locked gates and/or No Trespassing signs." Supp. App. 2. The Guide further recommends law enforcement assistance only to provide security for personal safety, and not to suggest they are necessary to facilitate forcible entry. *Id.* And further at odds with the government's position, the Guide states "There may be times during a confiscation operation" when inspectors should involve legal counsel "in the acquisition or service of a subpoena or warrant." United States Dep't of Agric., *Animal Welfare Inspection Guide* 8-28 (2013); *see* Aplt. Br. at 27. Thus, we see no factual or regulatory basis for a reasonable inspection agent to use force to enter a licensee's premises absent an emergency or exigent circumstances.[6]

Because we see no meaningful difference between the *Colonnade* inspection scheme and the one here, reasonable APHIS inspectors should have known they could not forcibly enter a business facility to perform an inspection, absent a warrant or an exception to the warrant requirement. Big Cats alleges facts showing that the agents cut the locks to conduct a non-emergency inspection where the regulations did not provide for forcible entry. The law is clearly

---

[6] This is an appeal from a motion to dismiss. It is possible that after discovery in this case we may see a different factual posture. Our task here is based on the allegations in the complaint. If the landscape changes after discovery, the government is entitled to seek summary judgment on qualified immunity. For purposes of our analysis, the legal posture here does not support a finding of a veterinary emergency or other exigent circumstances.

established that inspection officials cannot enter business premises without a warrant in those circumstances.

*B.  Section 1983*

We turn lastly to the question of whether Big Cats can sue the APHIS inspectors under § 1983 of the Civil Rights Act.  Big Cats contends the inspectors are subject to liability under § 1983 "because they acted under color of state law when they induced deputies to cut chains and enter the premises. . . ."  App. 57. We disagree.

Section 1983 is not directed at conduct by federal officials.  Instead, it provides a remedy against state actors who violate a federal right, pursuant to state authority.  Fallon, *supra*, at 986; *Monroe v. Pape*, 365 U.S. 167, 171–76 (1961), *overruled in part on other grounds*, *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658 (1978).  For this reason, federal employees are rarely § 1983 defendants, and "actions of the Federal Government and its officers are at least facially exempt from [§ 1983] proscriptions."  *District of Columbia v. Carter*, 409 U.S. 418, 424–25 (1973).  But in some cases, federal officials may in fact act under "color of state law" for § 1983 purposes.

The paradigmatic example is when federal officials conspire with state officials to infringe a protected constitutional right.  *Martinez v. Winner*, 771 F.2d 424, 441 (10th Cir. 1985) ("Federal officials ordinarily are not suable under § 1983, which requires action under color of state law, but they may be liable

-31-

under § 1983 where, as here, they are charged with conspiring with state officers or employees."), *vacated on other grounds*, 800 F.2d 230 (10th Cir. 1986).[7] Most courts agree that conspiracy with state actors is a requirement to finding that federal actors jointly acted under color of state law. *Strickland ex rel. Strickland v. Shalala*, 123 F.3d 863, 866–67 (6th Cir. 1997) ("[C]ourts finding that a *federal* official has acted under color of state law have done so only when there is evidence that federal and state officials engaged in a conspiracy or 'symbiotic' venture to violate a person's rights under the Constitution or federal law.").

Big Cats alleges the federal employees "acted jointly" with the deputies when they represented they had a court order to seize the cubs, and that "[r]elying on the USDA's representations, the deputies cut the chains." App. 54–55. These are insufficient allegations to establish a conspiracy. "[U]nder established case law, the fundamental characteristic of a conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of the underlying substantive criminal offense.'" *Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016) (alteration and citation omitted). The complaint must allege (1) an agreement between two or more persons, with (2) an intent to achieve an unlawful

---

7 *See also* Steven H. Steinglass, Section 1983 Litigation in State Courts § 2.8 (2015) ("Federal officials, however, may be found to have acted under the color of state law and thus subject to suit under § 1983 when they conspire with state officials."); William H. ReMine, Civil Suits for Civil Rights: A Primer on § 1983, Colo. Law., Nov. 1997, at 5, 6 ("Federal officials are not subject to suit under § 1983, unless they act in conspiracy with state officials.").

act.  Wayne R. LaFave, 2 Subst. Crim. L. § 12.2 (2d ed. 2003); *see also United States v. Hill*, 786 F.3d 1254, 1266 (10th Cir. 2015) (citing the elements of a conspiracy), *cert denied*, 136 S. Ct. 377 (2015).  The allegations of the complaint make it clear the El Paso County sheriff's deputies were not engaged in an agreement with the inspectors to pursue an unlawful act.  Read most favorably to Big Cats, the most that can be said is that the deputies were facilitating entry to the Big Cats premises on the false representation and mistaken impression that the inspectors had a court order to enter the facility.  There was no agreement to violate law; indeed, the El Paso County incident report in the record states the deputies thought their actions were supported by a court order and a need to check on the cubs' welfare.

To hold federal officials subject to § 1983 liability based on joint action, plaintiff must at least allege that federal and state actors shared a "common, unconstitutional goal," or point to a "substantial degree of cooperative action" or "overt and significant state participation."  *See Schaffer v. Salt Lake City Corp.*, 814 F.3d 1151, 1157 (10th Cir. 2016) (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1454 (10th Cir. 1995)); *see also Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1126 (10th Cir. 2000) (requiring conspiracy such that the state and non-state actors "'share[d] a common,

unconstitutional goal'" (quoting *Anaya v. Crossroads Managed Care Sys.*, 195 F.3d 584, 596 (10th Cir. 1999)).[8]

The district court nonetheless concluded the "enlistment of state law enforcement" was sufficient to hold federal officers liable under § 1983. The court and the government rely on an unpublished district court case from California for support, *Reynoso v. City & County. of San Francisco*, No. C 10-00984 SI, 2012 WL 646232 (N.D. Cal. Feb. 28, 2012). In that case, San Francisco police officers entered the plaintiff's residence to search for drugs. But the court found substantial concerted action by the state and federal officials. "After the premises was secured, the ATF agents 'merely substituted themselves for the agents of the City and County of San Francisco in the break-in of plaintiffs' home and took up the search and seizure initiated by the City and County of San Francisco authorities.'" *Id.* at *6 (citation omitted). Because the federal defendants were significant participants in the *state scheme*, those federal

---

[8] A plaintiff may well need to allege a higher level of coordination to show federal officers, rather than private parties, acted under color of state law. This is for several reasons. First, plaintiffs must overcome the presumption that Congress did not intend for federal officers to be subject to § 1983 litigation. *Carter*, 409 U.S. 418, 424–25. Second, plaintiffs must overcome the presumption that where federal and state actors come together, they are acting pursuant to supreme law. *See Arar v. Ashcroft*, 585 F.3d 559, 568 (2d Cir. 2009) (en banc) ("[S]ince 'federal officials typically act under color of *federal* law,' they are rarely deemed to have acted under color of state law." (citation omitted)). We need not resolve exactly what this showing looks like, however, because plaintiffs fail to meet any existing analysis that would prove these non-state actors acted under color of state law.

defendants' actions could "'fairly be attributed to the state.'" *Id.* at *5–6 (quoting *Cabrera v. Martin*, 973 F.2d 735, 742–43 (9th Cir. 1992)).

The circumstances here are quite different. The deputies were not actively engaged in pursuing a common law enforcement objective. Nor were they attempting to vindicate any state or county interest. They were only operating under the false assumption that the entry was authorized under federal law and pursuant to court order.

In sum, the complaint does not allege the federal and state actors shared an unconstitutional goal. Nor do we find sufficient state cooperation, considering the local deputies' entire involvement consisted of complying with the requests of the APHIS inspectors. More accurately, the federal officials are better seen as acting under color of *federal* law—the AWA—when they instructed the state officials to cut the locks.

Because the federal officials did not act under color of state law, the district court erred in denying the government's motion to dismiss the § 1983 claim.

## III. Conclusion

Big Cats may proceed with its *Bivens* claim because no inspector would have reasonably believed he could forcibly enter the business premises of a licensee in these circumstances. We therefore AFFIRM the district court's order denying the government's motion to dismiss the *Bivens* claim. We REVERSE the

court's order denying the government's motion to dismiss the § 1983 claim, however, because the federal officials did not act under color of state law.